1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IRFAN GOKCE,                          )
                                      )
              Petitioner,             )
                                      )        CASE NO. C02-2568RBL
      v.                              )
                                      )
JOHN D. ASHCROFT , et al.,            )        REPORT AND
                                      )        RECOMMENDATION
                                      )
              Respondents.            )
_____ )

## INTRODUCTION AND SUMMARY CONCLUSION

On December 26, 2002, petitioner filed, *pro se*, a habeas corpus petition pursuant to 28 U.S.C. § 2241, along with a motion for appointment of counsel, challenging his detention by the Immigration and Naturalization Service ("INS")[1], and his removal order to Turkey.[2] (Dkts. #4

_____

[1] Pursuant to the Homeland Security Act of 2002, 116 Stat. 2135, Pub. L. 107-296, *codified at* 6 U.S.C. § § 101, *et seq.*, alien detention, deportation, and removal functions were transferred from the Department of Justice to the Department of Homeland Security ("DHS") on March 1, 2003.  6 U.S.C. § 251 (2002).  Within the DHS, the former INS was reorganized into three bureaus serving separate functions.  The Bureau of Immigration and Customs Enforcement ("BICE") is responsible for deportations and investigations.  Because petitioner's case was filed prior to the reorganization, however, the Court will reference the INS and the BICE within this report and recommendation.

[2] Petitioner prepared the petition and motion with assistance from the American Immigration Law Foundation ("AILF").  (*See* Dkt. #5 at 2-3).

REPORT AND RECOMMENDATION
PAGE – 1

1  and #5).  Specifically, petitioner alleges that his mental incompetency requires the INS to appoint

2  him counsel in his immigration proceedings, which they have failed to do.  (*See* Dkt. #4 at 2).

3  Petitioner further alleges that because the Immigration Court has refused to move forward with

4  his removal proceedings unless he is provided counsel, and because the Immigration Judge ("IJ")

5  has refused to order court-appointed counsel, he is being detained indefinitely.  (Dkt. #4 at 2-3).

6  Respondents maintain that this Court lacks jurisdiction to appoint counsel at tax-payer expense

7  for Immigration Court proceedings.  (Dkt. #10).

8      Having reviewed the entire record, including the habeas petition (Dkt. #4), respondents'

9  return and status report ("RSR") and motion to dismiss (Dkts. #10 and #11), petitioner's reply

10  to the motion to dismiss (Dkts. #18 and #19), respondents' supplemental response (Dkt. #21), a

11  brief filed by *amicus curiae* in support of respondents (Dkt. #22), and the balance of the record,

12  I recommend that the Court GRANT petitioner's habeas petition, and DENY respondents'

13  motion to dismiss.

14                    **BACKGROUND**

15      Petitioner, Irfan Gokce, has a lengthy immigration background, which is made more

16  complicated by the fact that he suffers from mental illness.  Because petitioner's immigration

17  background helps explain the issue before this Court, a detailed history follows.

18      Petitioner is alleged to be a native and citizen of Turkey.  (Dkts. #4 at 4 and #11, Exhibit

19  A).  There appears to be no factual dispute about his entrance into the United States.  The parties

20  agree that petitioner entered illegally near Blaine, WA, on September 29, 2000, where he was

21  apprehended by Border Patrol agents and taken into custody.  (Dkts. #4 at 5 and #11, Exhibit A).

22  On the same day, the INS issued a Notice to Appear, placing petitioner in removal proceedings,

23  and alleging removability pursuant to section 212(a)(6)(A)(i) of the Immigration and Nationality

24  Act ("INA") in that petitioner had entered the United States without inspection.  (Dkt. #11,

25  Exhibit D).  The INS also set a $30,000 bond for his release.  (Dkt. #11, Exhibit C).

26      On October 12, 2000, petitioner appeared *pro se* at his removal hearing.  (Dkt. #4 at 5).

REPORT AND RECOMMENDATION
PAGE – 2

He apparently waived his right to an attorney, stating that he wanted to speak for himself.  (Dkt. #4 at 5).  The IJ then determined that petitioner was removable as charged.  Petitioner stated that he would be persecuted if he was removed to Turkey, so the IJ provided him an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  The IJ scheduled a merits hearing for October 17, 2000.  (Dkt. #19, Exhibit A at 6-8).

On October 17, 2000, petitioner again appeared at his hearing *pro se*.  (Dkt. #19, Exhibit A at 9).  The IJ first held a bond hearing, but declined to lower petitioner's bond.  (Dkt. #11, Exhibit E).  She then started the merits hearing.  When the IJ asked him his name, he answered the he didn't know.  (Dkt. #19, Exhibit A at 9).  When the IJ then asked if he was choosing to remain silent, he stated that he was choosing to become an American citizen.  The IJ explained that she could not grant him citizenship, but she could hear his asylum application.  (Dkt. #19, Exhibit A at 9-10).  Petitioner had not filled out his application, so he asked the IJ for a pen.  (Dkt. #19, Exhibit A at 10).  The IJ told him he could take the application and would have until October 30, 2000, to fill it out and return it.  (Dkt. #19, Exhibit A at 11).  She also explained that another merits hearing would be set for a later date.  Petitioner asked for a date the next day, and when the IJ told him that date was too early, he told her she was committing a crime.  (Dkt. #19, Exhibit A at 11).  Eventually, petitioner agreed to the October 30th date, and the hearing was concluded.  (Dkt. #19, Exhibit A at 11-12).

Petitioner submitted his asylum application by October 30, 2000, as directed.  On January 17, 2001, the IJ conducted an asylum hearing.  (Dkt. #19, Exhibit A at 45).  Petitioner was the only witness.  He testified that he had been arrested and beaten in Turkey because he left the military without permission.  (Dkt. #19, Exhibit A at 45-47).  He also testified that in 1989 he wanted to leave Turkey and come to America to become a movie star, but that the Turkish authorities stopped him and put him in a "mad house."  (Dkt. #19, Exhibit A at 58).  He then stated that both the Turkish authorities and the American authorities were giving him "medicine" through his food and water.  (Dkt. #19, Exhibit A at 59).  Petitioner continued to answer

REPORT AND RECOMMENDATION
PAGE – 3

questions, including:

> Q. Okay. Now, sir, when you were in Canada, according to your statement,
>    . . . you said you wanted from Canada INS 333 million American dollars
>    and prompt citizenship.
> A. Yes.
> Q. Did you make that request?
> A. I make that request.
> Q. And what did, what was their reaction when you asked for this?
> A. They said we send you baked turkey.
>    . . .
> Q. Okay. Now, when you were filling out this [asylum] application you said
>    . . . I want to make history --
> A. Uh-huh.
> Q. -- I want to be famous, rich and powerful.
> A. Yes.
> Q. I want to be president, king, or dictator or leader of a state or country --
> A. Yes.
>    . . .
> Q. Is this the first step, sir, for you to reestablish the Ottoman Empire and
>    take back the country such as Syria –
> A. Yes. Not only, there is a lot of things to do. A lot of things.

(Dkt. #19, Exhibit A at 60-63).

At the conclusion of petitioner's testimony, the IJ apparently expressed concern about his mental state, but nonetheless denied all of petitioner's requested forms of relief. (Dkt. #4 at 6). On January 29, 2001, the IJ issued a 26-page written decision, detailing her denial of asylum, withholding of removal, and protection under the CAT. (Dkt. #11, Exhibit F). She ordered petitioner removed to Sweden, or, in the alternative, to Turkey. (Dkt. #11, Exhibit F at 26).

On February 13, 2001, petitioner filed a timely appeal with the Board of Immigration Appeals ("BIA"). (*See* Dkt. #11, Exhibit G at 1). On September 21, 2001, the BIA issued its decision. (Dkt. #11, Exhibit G). The BIA determined that because the IJ and respondents concurred that petitioner had "mental issues," and because the IJ's decision had relied in part on an adverse credibility finding, the case should be remanded so that the IJ could determine whether petitioner had been mentally competent to waive counsel during his removal proceedings. (Dkt. #11, Exhibit G).

The IJ held petitioner's first hearing on remand on October 9, 2001. (Dkt. #19, Exhibit B

REPORT AND RECOMMENDATION
PAGE – 4

1   at 1-2).  The IJ asked the INS to have petitioner evaluated by a psychologist, and continued the

2   hearing until October 29, 2001.  (Dkt. #19, Exhibit B at 1-2).  Petitioner's case was subsequently

3   continued three times because the INS had not had the evaluation completed.  (Dkt. #4 at 6).

4        On November 16, 2001, petitioner appeared at a hearing before a different IJ because the

5   one presiding over his proceedings was not available.  (Dkt. #4 at 6).  At that hearing, the INS

6   apparently submitted a five-sentence document entitled "Progress Notes" from a social worker

7   who had spoken to petitioner.  (Dkt. #19, Exhibit C).  The document, dated November 12, 2001,

8   concluded that petitioner was competent to participate in his removal proceedings.  The social

9   worker was not present at the hearing, nor did petitioner present additional evidence.  The IJ

10   made no finding at that time, instead stating that the case would be scheduled for a hearing

11   before the presiding IJ.  (Dkt. #4 at 7).

12        Petitioner appeared at his next hearing on January 17, 2002.  He apparently informed the

13   IJ that he wanted an attorney, and his case was continued.  (Dkt. #4 at 7).  Over the next several

14   months, petitioner's case continued to be rescheduled so that he could try and find legal

15   assistance.  Finally, on March 29, 2002, the IJ held a hearing on petitioner's asylum application.

16   (Dkt. #4 at 7).

17        Petitioner appeared *pro se* at his asylum hearing.  Once again, he seemed to have little

18   understanding of how to proceed with his defense, answering the majority of the IJ's questions

19   with "I do not understand,"  "no comment," or "no answer."  (Dkt. #19, Exhibit B at 22-41).

20   Petitioner also told the IJ that she was "a no good person," and that he believed anything he said

21   would be used against him.  (Dkt. #19, Exhibit B at 30 and 32).  Finally, petitioner declared that

22   neither the IJ, the INS attorney, the American government, nor the American media had treated

23   him well.  (Dkt. #19, Exhibit B at 34-35).  He stated his belief that the American and Turkish

24   governments were working together against him, and that "one day . . . when I come out, I will

25   tell everything."  (Dkt. #19, Exhibit B at 36).

26        After listening to petitioner's testimony, the IJ closed the proceedings, stated that she

REPORT AND RECOMMENDATION
PAGE – 5

1 would issue a written decision shortly, and asked petitioner to designate a country of removal
2 should she deny his application.  (Dkt. #19, Exhibit B at 40).  Petitioner said she could remove
3 him to Switzerland or Mexico.  The IJ told him that she could not designate Mexico for removal,
4 and he responded, "then send me to the moon."  (Dkt. #19, Exhibit B at 40).  The IJ
5 subsequently designated Switzerland and, in the alternative, Turkey.  (Dkt. #19, Exhibit B at 41).

6           That same day, March 29, 2002, the IJ issued a 13-page written decision.  (Dkt. #11,
7 Exhibit H).  The IJ first found that petitioner was competent to participate in his removal hearing.
8 (Dkt. #11, Exhibit H at 11).  The IJ then once again denied petitioner's applications for relief,
9 incorporating by reference her prior decision.  (Dkt. #11, Exhibit H at 12-13).  This time, she
10 ordered petitioner removed to Switzerland or, in the alternative, to Turkey.  (Dkt. #11, Exhibit H
11 at 12-13).

12           On April 29, 2002, petitioner appealed the IJ's decision to the BIA.  (Dkt. #4 at 8).  His
13 case was sent for screening by the BIA's Pro Bono Project.  (Dkt. #4 at 8).  That project
14 distributes descriptions of the screened cases to *pro bono* attorneys around the country.  The
15 primary responsibility of the volunteer *pro bono* attorneys is to prepare and file an appeal brief on
16 their clients' behalf.  (Dkt. #4 at 8).  In petitioner's case, a *pro bono* attorney from New York,
17 New York, agreed to represent him on appeal.  She entered her appearance before the BIA, and
18 filed an appeal brief.  (Dkt. #4 at 8-9).

19           On November 6, 2002, the BIA once again remanded petitioner's case to the IJ for
20 "further fact-finding with respect to [petitioner's] mental competency."  (Dkt. #11, Exhibit J at
21 2).  The BIA aassumed that petitioner's *pro bono* attorney would continue to represent petitioner
22 before the IJ, declined to address any issues raised in the appeal brief, and stated that "at this
23 juncture the burden [of proving mental incompetency] in this case lies squarely with [petitioner's]
24 counsel."  (Dkt. #11, Exhibit J at 2).

25           On November 14, 2002, petitioner's *pro bono* counsel filed a motion to reconsider the
26 BIA's decision because it was based, in part, on the erroneous assumption that she would

REPORT AND RECOMMENDATION
PAGE – 6

1   represent petitioner before the IJ on remand.  (Dkts. #4 at 9 and #19, Exhibit E).  Counsel

2   explained that there was never any indication in her appeal brief that she would represent

3   petitioner in Immigration Court, nor did she ever agree to representation beyond the BIA appeal.

4   (Dkt. #19, Exhibit E at 1-3).  The Court notes that *pro bono* counsel works and reside in New

5   York, not Seattle.  As of March 24, 2003, that motion was still pending.  (*See* Dkt. #18 at 7).

6       In the meantime, petitioner appeared at several more hearings in Immigration Court.

7   Petitioner continued to request counsel, and the hearings were rescheduled to allow him time to

8   find legal assistance.  (Dkt. #4 at 9).  At a hearing on December 3, 2002, the IJ continued

9   petitioner's case until December 30, 2002, but apparently stated that if petitioner appeared

10  without counsel, she would certify the case to the BIA for further guidance.  (Dkt. #4 at 9).

11      On December 26, 2002, petitioner filed, *pro se*, the instant habeas petition, along with a

12  motion to appoint counsel.  (Dkts. #4 and #5).  The petition and motion were prepared with

13  assistance from the American Immigration Law Foundation ("AILF").  (*See* Dkt. #5 at 2-3).

14      On January 15, 2003, the undersigned Magistrate Judge ordered respondents to file their

15  return and status report ("RSR") no later than 30 days from the date of that order.  (Dkt. #6).

16  On February 18, 2003, respondents filed their RSR, along with a motion to dismiss.  (Dkt. #10).

17  Respondents argued that this Court has no authority to appoint counsel in immigration

18  proceedings, even where the petitioner is mentally ill.  (Dkt. #10 at 3-6).  Respondents also

19  acknowledged that petitioner suffers from a questionable mental state, and encouraged this Court

20  to "facilitate" the search for, rather than appoint, *pro bono* counsel for his immigration

21  proceedings.  (Dkt. #10 at 1).  Finally, respondents noted that an Immigration Court hearing had

22  been scheduled for February 21, 2003, to address petitioner's request for counsel.  (Dkt. #10 at

23  2).

24      On the same date, February 18, 2003, this Court appointed counsel for petitioner's habeas

25  proceedings, and subsequently allowed an attorney from the American Immigration Law

26  Foundation ("AILF") in Washington, D.C., to be admitted *pro hac vice* to assist appointed

REPORT AND RECOMMENDATION
PAGE – 7

1  counsel.  (Dkts. #9 and #15).  The Court has also allowed Friends of Immigration Law

2  Enforcement ("FILE") to file an *amicus* brief in support of respondents at their request.  (Dkts.

3  #22 and #25).

4        On March 24, 2003, petitioner's newly-appointed counsel filed a supplemental brief and

5  motion to appoint counsel in petitioner's immigration proceedings.  (Dkts. #17 and #18).  On

6  April 18, 2003, respondents filed their response, along with a cross-motion for a Rule 16 pretrial

7  conference.  (Dkt. #21).  Petitioner objected to a pretrial conference, stating that it was not

8  necessary in this case.  (Dkt. #24).

9        On May 1, 2003, respondents filed a "Suggestion of Mootness and Uncontested Motion

10  to Hold Proceedings in Abeyance."  (Dkt. #26).  Respondents explained that a local immigration

11  attorney had entered a notice of appearance in petitioner's immigration proceedings, which

12  would most likely render the instant proceedings moot.  (Dkt. #26 at 2).  The parties, however,

13  requested that the Court hold these proceedings in abeyance for 60 days in order to confirm that

14  petitioner's immigration case actually moved forward on the merits, and that the issue in the

15  instant case had indeed been mooted.  (Dkt. #26 at 2).  The Court granted the parties request,

16  and ordered them to file a Joint Status Report ("JSR") regarding the status of petitioner's

17  immigration proceedings on or before July 11, 2003.  (Dkt. #26).

18        On July 11, 2003, the parties filed a stipulated request for extension of time in which they

19  would file their JSR.  (Dkt. #28).  The parties informed the Court that they had just discovered

20  that petitioner's *pro bono* immigration counsel had been allowed to withdraw from petitioner's

21  case, that petitioner had attended a recent immigration hearing *pro se*, and that further

22  immigration proceedings had been scheduled.  (Dkt. #28 at 1-2).  The parties asked for a two-

23  week extension of time in which to file their JSR so that they could provide the Court with more

24  complete information.  The Court granted the parties' request.  (Dkt. #29).

25        On July 24, 2003, the parties filed their JSR.  (Dkt. #30).  Petitioner's position was that

26  the case is now fully briefed and it should proceed to the adjudication of any pending motions

REPORT AND RECOMMENDATION
PAGE – 8

1   and of the claims raised in the petition.  (Dkt. #30 at 1).  Respondents' position was that the

2   habeas petition should be held in abeyance for an additional period of time so that counsel could

3   continue their efforts to locate replacement *pro bono* counsel for petitioner in his immigration

4   proceedings.  (Dkt. #30 at 1).  In the alternative, respondents again asked that this case be set for

5   a pretrial conference.

6          On July 29, 2003, the Court denied respondents' request to further hold these proceedings

7   in abeyance and for a pretrial conference.  (Dkt. #31).   The Court agreed with petitioner that a

8   conference was not necessary in this case, and that the issues had been fully briefed.  (Dkt. #31 at

9   2).  Accordingly, the undersigned Magistrate Judge re-noted the habeas petition and respondents'

10  motion to dismiss for consideration on August 22, 2003.

11         On August 21, 2003, respondents filed a supplemental status report and memorandum.

12  (Dkt. #32).  Respondents stated that they had recently learned of a psychological evaluation of

13  petitioner by a psychologist in Tumwater, WA.  (Dkts. #32, #33 and #34).  Respondents further

14  stated that they had not seen the results from the evaluation, but that they had reason to believe

15  petitioner was found competent to proceed in Immigration Court without counsel.  (Dkt. #32 at

16  1-2).  Respondents also stated that the only reason petitioner has not been able to find *pro bono*

17  assistance with his immigration proceedings is because his appointed counsel in this Court has

18  interfered in some manner, apparently by asking local immigration attorneys not to appear in

19  petitioner's immigration proceedings so he can use the instant proceedings as a "test case."  (Dkt.

20  #32 at 2).  Respondents provide no support for their opinion.

21         On August 22, 2003, the Court re-noted these proceedings for consideration on

22  September 12, 2003, because it required a response from petitioner, specifically addressing

23  respondents' recent allegations, and also requested that a copy of petitioner's psychological

24  evaluation be filed with the Court.  (Dkt. #35).

25         On September 11, 2003, petitioner filed a copy of the evaluation under seal.  (Dkt. #38).

26  At the same time, he filed his response to respondents' supplemental RSR.  (Dkt. #37).

REPORT AND RECOMMENDATION
PAGE – 9

1  Petitioner asserts that respondents are mistaken about the results of his psychological evaluation,

2  and categorically denies respondents' allegation that counsel is interfering with the entrance of

3  any *pro bono* attorney in his immigration proceedings.  (Dkt. #37 at 1-5 and Exhibits 1-6).  The

4  briefing is now complete and the petition is ripe for review.

5  **DISCUSSION**

6      *1.*    <u>*Fundamental Fairness*</u>

7        Petitioner has been held in immigration custody for more than three years, while his

8  immigration proceedings have been mired down with questions about his competency and ability

9  to represent himself.  Petitioner argues that because the Immigration Court can't appoint counsel,

10  but also won't proceed if he is unrepresented, he is "trapped in a legal quandary."  (Dkt. #18 at

11  1).  As a result, petitioner asserts that he has, and continues to be, denied his right to a fair

12  hearing as required by the INA and the Fifth Amendment to the U.S. Constitution.  (Dkt. #18).

13  Petitioner asks this Court to follow the case-by-case approached adopted by the Sixth Circuit,

14  and appoint counsel in his case as a matter of fundamental fairness.  (Dkt. #18 at 8).

15        Respondents answer that this Court lacks jurisdiction to appoint counsel in immigration

16  proceedings.  (Dkt. #10).  They essentially argue that petitioner has no right to court-appointed

17  counsel, and that this Court has no authority to appoint counsel at taxpayer expense.  (Dkt. #10

18  at 4-6).  Respondents note that Congress has not designated funds under the Criminal Justice Act

19  ("CJA"), 18 U.S.C. 3006A, for appointing counsel in immigration proceedings.  (Dkt. #10 at 4).

20  Respondents also note that Congress has explicitly denied court-appointed counsel under INA

21  § 292.  (Dkt. #10 at 5).  Finally, respondents argue that the Sixth Amendment right to counsel

22  does not apply to civil immigration proceedings.  (Dkt. #10 at 5-6).  For the reasons sets forth

23  below, the Court is not persuaded by respondents' arguments.

24        Aliens in removal proceedings have numerous statutory rights.  For example, Congress

25  has specifically provided non-resident aliens with the right to counsel, albeit at no expense to the

26  government.  INA § 292.  Although there is no provision for court-appointed counsel, Congress

REPORT AND RECOMMENDATION
PAGE – 10

1    has also recognized that some categories of aliens need extra protection.  Section 240 of the INA

2    states that "[i]f it is impracticable, by reason of an alien's mental incompetency, for the alien to be

3    present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights

4    and privileges of the alien."  INA § 240(b)(3).  Especially relevant to this case, the regulations

5    implementing § 240 prevent an IJ from accepting an admission of removability from an alien who

6    is incompetent and not accompanied by counsel or some other legal representative.  8 C.F.R. §

7    1240.10(c), *formerly codified as* § 240.10(c).

8          For nearly 40 years, federal courts have recognized that there are several civil contexts in

9    which a court must employ the fundamental fairness analysis to ensure that due process has been

10   afforded.  Indeed, the U.S. Supreme Court has held that the right to appointment of counsel is

11   not exclusive to the Sixth Amendment, and is, in fact, required as a matter of fundamental

12   fairness in other cases.  *See e.g.*, *In re Gault*, 387 U.S. 1, 47 (1967) (appointing counsel in

13   delinquency proceedings); *Vitek v. Jones*, 445 U.S. 480, 500 (1980) (holding that appointment of

14   counsel is necessary for the transfer of prisoners to mental health facilities); *see also Lassiter v.*

15   *Dept. of Social Serv's*, 452 U.S. 18, 21 (1981) (holding that appointment of counsel may be

16   required in termination of parental rights cases).

17         In addressing due process rights in the immigration context, the Sixth Circuit Court of

18   Appeals concluded that fundamental fairness may require the appointment of counsel in some

19   removal proceedings.  *Aguilera-Enriquez v. INS*, 516 F.2d 565 (6th Cir. 1975).  The Court

20   explained that "[t]he test for whether due process requires the appointment of counsel for an

21   indigent alien is whether, in any given case, the assistance of counsel would be necessary to

22   provide 'fundamental fairness – the touchstone of due process.'"  *Aguilera-Enriquez*, 516 F.2d at

23   568 (citation omitted).

24         The Ninth Circuit has implied that it would use a similar approach if presented with the

25   question of whether to appoint counsel in immigration proceedings.  In *Escobar-Ruiz v. INS*, 787

26   F.2d 1294 (9th Cir. 1986), an attorney's fees case, the Ninth Circuit Court of Appeals noted that:

REPORT AND RECOMMENDATION
PAGE – 11

1     Congress' treatment of indigent aliens in §§ 292 may not be constitutional as
    applied in individual cases. The fifth amendment guarantee of due process
2     applies to immigration proceedings, and in specific proceedings, due process
    could be held to require that an indigent alien be provided with counsel *despite*
3     *the prohibition of section 292.*

4 *Escobar-Ruiz*, 787 F.2d at 1297 n. 3 (emphasis added)(citation omitted).  As petitioner

5 highlights, *Escibar-Ruiz* does not conflict with respondents' assertion that the Sixth Amendment

6 right to counsel does not apply in civil immigration proceedings.  (*See* Dkt. #18 at 9).

7     Although respondents argue that there is no provision in the CJA that would allow this

8 Court to appoint paid counsel, the Court disagrees.  The CJA provides, in relevant part, that:

9     Each United States district court, with the approval of the judicial council of
    the circuit, shall place in operation throughout the district a plan for furnishing
10     representation for any person financially unable to obtain adequate
    representation in accordance with this section. Representation under each plan
11     shall include counsel and investigative, expert, and other services necessary for
    adequate representation. Each plan shall provide the following:
12       (1) Representation shall be provided for any financially eligible
      person who--
13       . . .
       I) faces loss of liberty in a case, and Federal law requires the
14        appointment of counsel . . .

15 18 U.S.C. § 3006A(a)(1)(F).  The Court believes that, under the circumstances of this case,

16 petitioner fits into that category.  Petitioner has already been in detention for three years, and will

17 continue to remain there, potentially indefinitely, unless his immigration case moves forward.

18 Furthermore, as discussed above, the Ninth Circuit has recognized that some immigration

19 proceedings may require the appointment of counsel to comport with Fifth Amendment due

20 process requirements.  *Escobar-Ruiz*, 787 F.2d at 1297 n. 3 (citation omitted).

21     This interpretation is not inconsistent with INA § 292.  That section of the INA allows

22 aliens to be represented before the Immigration Court or the BIA, but makes clear that the

23 government is not obligated to pay for that counsel.  INA § 292.  While that section does not

24 entitle an alien the right to free legal assistance, it does not forbid the appointment of such

25 assistance either.  The statute merely informs aliens that there is no automatic right to free

26 counsel.  Thus, this Court, finds it appropriate to appoint CJA counsel in some cases as an

REPORT AND RECOMMENDATION
PAGE – 12

1  exercise of discretion.  As for respondents' argument that this rationale may open the floodgates

2  to free legal assistance for all aliens in immigration proceedings, the Court is not alarmed.  In this

3  Court, appointment of counsel is not made without consideration of the merits of the case, the

4  complexity of the legal issues raised, and the ability of the petitioner to adequately represent

5  himself.  Therefore, the Court also has the ability to control which immigration cases would be

6  appropriate for appointed counsel on a case-by-case basis.

7         As demonstrated by the multiple remanded proceedings from the BIA, petitioner has

8  clearly been unable to adequately represent himself on his asylum application.  Moreover, in the

9  opinion of the psychologist who recently evaluated him, petitioner is not competent to represent

10  himself in any legal proceedings, nor is he competent to present evidence on his own or

11  otherwise meaningfully participate in his immigration proceedings.  (Dkt. #38, Affidavit of Dr.

12  Bremer).  The psychologist did determine that petitioner met the criminal standard for mental

13  competency, in as much as he knows right from wrong, (*see* Dkt. #38, Exhibit 7 at 5); however,

14  the record supports petitioner's argument that he has not been able to understand the asylum

15  proceedings thus far, let alone present evidence in his own defense.  (Dkt. #38, Exhibit 7).  All of

16  these factors lead this Court to the conclusion that petitioner should be appointed counsel under

17  the CJA as a matter of fundamental fairness under the Fifth Amendment guarantee of due

18  process.

19         2.     *Doctrine of Constitutional Avoidance and Antideficiency Act*

20         The Court is not persuaded by respondents' arguments that the Doctrine of Constitutional

21  Avoidance and the Antideficiency Act prevent it from reviewing petitioner's due process

22  arguments.  (*See* Dkt. #10 at 6 and 8).  First, respondents' argument pertaining to constitutional

23  avoidance was based on the assumption that *pro bono* assistance would be found for petitioner.

24  After months of searching, it appears that it is not likely to happen.  Accordingly, respondents'

25  argument is without merit.

26         Second, respondents' argument pertaining to the Antideficiency Act is not clear.  The Act

REPORT AND RECOMMENDATION
PAGE – 13

1   applies to "an officer or employee of the United States Government or of the District of

2   Columbia government," 31 U.S.C. § 1341(a), and was intended to address government officials

3   who "were obligating funds before they were appropriated by Congress, and then making

4   deficiency requests for appropriations that Congress had little choice in deciding . . . ." *Cessna*

5   *Aircraft Co. v. Dalton*, 126 F.3d 1442, 1448-49 (Fed. Cir. 1997) (citation omitted).

6   Respondents submit that this Court would violate the Act if it was to appoint counsel, but

7   provides no support for that proposition. Furthermore, as petitioner notes, "the Supremacy

8   Clause prohibits the government from relying on the Act to avoid compliance with a

9   constitutionally mandated right." (Dkt. #18 at 17). Therefore, respondents' argument fails.

10

11       3.       *Petitioner Holds the Keys to his Release*

12       Finally, the Court rejects respondents' argument that "petitioner holds the keys to his

13   release," in that he can ask his current counsel to represent him in immigration court or he could

14   withdraw his asylum application and accept deportation, both of which would moot this case.

15   (Dkt. #32 at 2-3). This argument is both insincere and legally incorrect.

16

17       Respondents argue that petitioner can "accept deportation" and "restore his liberty within

18   days." (Dkt. #32 at 3). However, this statement ignores the statutory mandate that an IJ may

19   not accept an admission of removability from an alien who is incompetent and not accompanied

20   by counsel or some other legal representative. 8 C.F.R. § 1240.10(c), *formerly codified as* §

21   240.10(c).

22       Respondents also argue that petitioner's court-appointed counsel in this case is somehow

23   prolonging his detention, submitting what appear to be bald accusations of counsel's interference

24   with *pro bono* assistance. (Dkt. #32 at 1-2). Petitioner's attorney has gathered numerous

25   affidavits from local immigration attorneys demonstrating that these accusations are not true.

26

REPORT AND RECOMMENDATION
PAGE – 14

(Dkt. #37, Exhibits 1-6).  The general consensus seems to be that petitioner's case is not appropriate for *pro bono* assistance because it will be extremely labor-intensive, and made more complex by petitioner's mental illness; but not because petitioner's counsel is thwarting any efforts to secure legal help for his client.  (Dkt. #37, Exhibits 1-6).

The Court acknowledges, and thanks, the efforts by both parties to resolve this case without the intervention of this Court.  However, petitioner has been waiting for resolution long enough.  As the BIA noted in its second decision to remand:

> if the respondent is mentally unbalanced he may be incapable of presenting his asylum claim in a coherent manner and may be unable to understand his fundamental need to retain counsel. Yet the behavioral manifestations of these same mental problems may make him peculiarly vulnerable to treatment proscribed by the Convention Against Torture if he is returned to his homeland. We believe this legal quandary can be resolved [with the assistance of counsel]."

(Dkt. #11, Exhibit J at 2).

## CONCLUSION

For the reasons set forth above, the Court recommends that the habeas petition (Dkt. #4) be GRANTED, and that respondents' motion to dismiss (Dkt. #10) be DENIED.  The Court should appoint legal counsel for petitioner's immigration proceedings pursuant to the CJA.  A proposed order accompanies this Report and Recommendation.

DATED this 25th day of September, 2003.

/s/ Monica J. Benton
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE – 15